RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2001 FED App. 0262P (6th Cir.)
File Name:  01a0262p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

    *v.*

ROBERT SUAREZ,
    *Defendant-Appellant.*

No. 99-1521

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 97-81175—Bernard A. Friedman, District Judge.

Argued:  November 3, 2000

Decided and Filed:  August 8, 2001

Before:  KEITH, BOGGS, and COLE, Circuit Judges.

_____

### COUNSEL

**ARGUED:**  Carole M. Stanyar, Detroit, Michigan, for Appellant. Jonathan Tukel, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Carole M. Stanyar, Detroit, Michigan, for Appellant. Jonathan Tukel, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

1

BOGGS, J., delivered the opinion of the court with respect to Parts I-V. COLE, J. (pp. 33-35), delivered a separate opinion as to Part VI, in which KEITH, J., concurred, which constitutes the opinion of the court as to Part VI.

————————

**OPINION**

————————

BOGGS, Circuit Judge. Robert Suarez, a former police officer, was convicted by a jury of two violations of 18 U.S.C. § 666(a)(1)(A) for converting police evidence and victim restitution money to his own benefit. He was acquitted of several other charges, most notably bribery counts, and dozens of other charges, mainly having to do with violations of the Travel Act, were dismissed prior to trial. Suarez was sentenced to 37 months in prison. Suarez appeals his convictions on the grounds that he was prosecuted vindictively, that there was a failure to suppress a statement taken in violation of his right to counsel, and that the agency from which he stole has an insufficient connection with the federal government to fit within the language of the statute under which he was charged. As to one of the counts, he claims he should have received a directed verdict due to a defective indictment. For the reasons that follow, the court will affirm Suarez's convictions.

**I**

At the time of his trial, Robert Suarez was a 21-year veteran of the Dearborn Police Department ("DPD"), holding the rank of Detective Sergeant since 1991. Suarez was a bunco investigator and specialized in "traveling criminal groups." In particular, he concentrated on property crimes perpetrated by a number of groups of mainly Romany descent, known in

speculation that should in no way inform our resolution of an issue that is squarely governed by controlling authority:

> The majority of the argument offered by Tatum appears to rest on Justice Scalia's concurrence and on further analysis of which justices in [*H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989)] are still on the court. Such arguments are inappropriate. While we understand that changes in Court personnel may alter the outcomes of Supreme Court cases, we do not sit as fortune tellers, attempting to discern the future by reading the tea leaves of Supreme Court alignments. *Each case must be reviewed on its merits in light of precedent, not on speculation about what the Supreme Court might or might not do in the future, as a result of personnel shifts.*

*Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1107 n.3 (6th Cir. 1995) (Boggs, J.) (emphasis added). Thus, until and unless the Supreme Court establishes a nexus requirement, we are obligated to follow the law set forth in *Dakota* and *Valentine. See LRL Props. v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1105 n.2 (6th Cir. 1995) ("It is the well-settled law of this Circuit that a panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." (internal quotation marks, citation, and alteration omitted)). I would accordingly affirm the district court's disposition of this issue.

Likewise, in *Dakota*, another panel of this Court confronted the question of whether prosecution under 18 U.S.C. § 666 requires a showing of a nexus between the alleged criminal misconduct and the federal funding received by the local agency. *See* 197 F.3d at 826. In resolving this question, we recognized that the Supreme Court had previously determined that no direct nexus was necessary, *see Salinas v. United States*, 522 U.S. 52, 61 (1997), but suggested that its decision left unanswered the question whether *some* connection was required for proper application of 18 U.S.C. § 666. We nevertheless declined to reach this question and, instead, reiterated our view first set forth in *Valentine* "that 18 U.S.C. § 666 does not require a nexus between the alleged bribes and the federal funding received by [the recipient agency]." *Dakota*, 197 F.3d at 826.

The dissent argues that "*Dakota* has been undermined by *Fischer v. United States*, 529 U.S. 667 (2000)," *ante* at 27, and concludes that in light of *Fischer*, "it is no longer tenable to hold to the proposition that no connection whatsoever need exist between the federally punished criminal conduct and the federal interest in the programs supported by the funds used to satisfy § 666(b)," *ante* at 28. I disagree. A close examination of *Fischer* reveals, as the dissent itself concedes, that "the question in *Fischer* turned on a somewhat different issue, on whether to characterize certain forms of federal aid as 'benefits.'" *Ante* at 27. Indeed, the *Fischer* Court never addressed the precise question raised by the instant appeal, *i.e.*, whether the alleged theft or bribery must touch upon the recipient agency's federal funding.

In urging a federal nexus requirement, the dissent relies upon recent Supreme Court federalism jurisprudence and Justice Thomas's dissent in *Fischer* (in which Justice Scalia joined) to suggest that a majority of the Court, if confronted with the issue, would require some nexus, because it has in recent cases favored certain "jurisdictional prerequisites for federal regulation of local criminal conduct." *Ante* at 27-28 & n.7. Any such suggestion, however, of what a majority of the Supreme Court *might* believe is nothing more than mere

common parlance as Gypsies.[1] He became well-known for his expertise on Gypsy crime, serving as a consultant on such issues throughout the Midwest and Canada. He appears to have been the "point man" for this type of crime in Dearborn, where he was credited with a substantial reduction of criminal activity, and the resolution of numerous cases.

Suarez's techniques involved developing a close knowledge of local Gypsy families and community, including the use of informants. He would also apparently often seek restitution for victims of fraud or larceny from suspected perpetrators or their families; in exchange the victims would agree to drop criminal charges, even in cases where restitution was less than total. One of Suarez's main informants was an ex-convict known as Steve "Tula" Miller, his co-defendant below. Tula Miller[2] had apparently contacted Suarez from prison in Lima, Ohio and informed him that the Gypsy community of Detroit was leaderless and that Tula wished to take it over. Exactly what Suarez promised to do for Tula and was promised in return was disputed below, but is ancillary to this appeal. Although the term is not used below, it appears Tula wished to acquire something like the traditional Gypsy status of "rom baro." *Cf. Marks v. Clarke*, 102 F.3d 1012, 1019 (9th Cir. 1996) (describing some features of this role). One traditional function of a rom baro is as an intermediary between a Gypsy

---

[1] The term "Gypsy" is perhaps somewhat imprecise and is disfavored by a number of scholars and Rom (as many feel it bears some derogatory connotations). *See United States v. Marks,* 947 F. Supp. 858, 861 (E.D. Pa. 1996) (discussing this nomenclature problem). To some extent, prejudice may have infected this case -- defendant's counsel complains police took "the word of ruthless, violent lying gypsy [sic] felons over that of a 21-year veteran of the police force." (Suarez Reply Br. at 10). To the extent this bias existed, however, it probably helped Suarez by discrediting the witnesses against him. Because the record here speaks in terms of Gypsies and the persons involved self-identify in this way, the particular Romani-Americans involved in this case will be referred to as Gypsies.

[2] Because there are numerous Millers in this case, including another Steve Miller, this name is used.

community and the authorities. Apparently in an attempt to assume this role, it seems that Tula would (for a fee) assist Suarez in identifying and locating suspects, and in negotiating restitution agreements. As a result, victims would get some of their money back, Suarez would solve the case, the Gypsies would stay out of jail, and Tula would make some money as well as demonstrate his capacity to either invoke the power of the State of Michigan or to protect "his" people against it.

In July 1997, allegations began circulating to the Detroit FBI that Suarez was seeking personal financial benefit from his system of "community policing." Specifically, the Chicago Police Department had been informed by local Gypsies that Suarez would take care of cases for a fee; also, a member of the extended Miller family in Toledo told the FBI Suarez was seeking money from them by threatening to (properly) charge several Millers with a Detroit-area burglary. Along with leniency with regard to this particular crime, a number of these Millers (in a Pennsylvania jail at the time) hoped for favorable treatment in exchange for bringing down Suarez. They made numerous allegations of corruption against the defendant, including a claim that he would remove warrants from the electronic Law Enforcement Information Network (LEIN) and National Crime Information Center (NCIC) systems for a price. The FBI began a public corruption investigation and induced Nancy Miller, the mother and grandmother of several of the individuals being threatened – and the chief negotiator of payments to Suarez – to wear a wire during her meetings with the detective. Based on the results of this initial investigation Suarez was charged with conspiracy to extort, 18 U.S.C. § 1951, 18 U.S.C. §§ 371-372, and arrested on October 1, 1997.

The focus of the FBI's inquiry was initially on issues of bribery. The first, single-count indictment against Suarez charged him with a bribery violation of 18 U.S.C. § 666(a)(1)(B). Essentially, the theory of the FBI appears to have been that while Suarez would sometimes partially compensate victims with the money he received, he sometimes would not, and would often in any event take a

---

**OPINION**

---

R. GUY COLE, JR., Circuit Judge, writing for the Court as to Part VI and concurring in the remainder of the majority opinion. Were we writing on a clean slate, I, like the dissent, might well agree that proper application of 18 U.S.C. § 666 requires a minimal nexus between the alleged criminal activity and the federal funding received pursuant to that statute. We are not, however, as a review of our decisions in *United States v. Valentine*, 63 F.3d 459 (6th Cir. 1995)*,* and *United States v. Dakota*, 197 F.3d 821 (6th Cir. 1999), makes clear. Thus, while I concur in Parts I through V, I write separately to register my disagreement with the dissent in Part VI, because I believe it disregards the well-established law of this Circuit.

In *Valentine*, a defendant challenged her convictions under 18 U.S.C. § 666, arguing in part that because the funds she was convicted of misappropriating were entirely local in source and in no way connected to a federal program, her prosecution and conviction violated the statute and offended traditional notions of federalism. *See* 63 F.3d at 464-65. She reasoned that a mere coincidence that the city agency for which she worked received § 666-qualifying federal funding was, without more, insufficient to sweep within the scope of a federal statute behavior that in no way touched upon federal funds. *See id.* We rejected Valentine's argument after a careful review of the statutory language and the legislative history underlying 18 U.S.C. § 666, finding that "the statute does not require the government to demonstrate the federal character of the stolen property" and concluding that "[t]he statute addresses the relationship between the federal government and the local government from which the property was stolen, not the relationship between the federal government and the converted property." *Id.* at 464.

characterization).    The best reading of the *Fischer* and *Salinas* cases seems to be that the Supreme Court does not want this interpretation to take hold.    Despite the government's (perhaps tactical) admission that here there is no possible connection to federal funds, a new trial appears to be the proper remedy.  In *Zwick*, the Third Circuit refused to enter a judgment of acquittal where there was an absence of trial proof of federal interest, and very little record evidence of one.  *See* 199 F.3d at 688.  Instead, it remanded for a new trial.  In this, of course, I am mindful that because of the unique nature of this case, witnesses would be peculiarly unavailable; however, the primary evidence on which Suarez was convicted was documentary and would present relatively little difficulty to reconstruct.    Given Suarez's own admissions, the conclusion that he stole is hardly controverted.  The government's main burden, if it chose to proceed, would be to show a valid federal interest in Suarez's conversions, by an inquiry into the "structure, operation, and purpose" of federally funded programs, and a determination of whether their integrity was undermined by criminal conduct for which Suarez has not already been acquitted.

## VII

For the reasons given above in Parts I-V, we find Suarez's various procedural claims to be without merit.  Because my colleagues also find Suarez's federal-nexus claim insufficiently persuasive, Suarez's convictions are AFFIRMED, a result from which I respectfully dissent for the reasons given in Part VI.

substantial "cut" for himself in exchange for allowing criminals to remain at large.  His financial and personal relationship with Tula was thought to have evolved from one of detective-informant to that of partners in crime.

Suarez's need for money had increased because of his growing gambling addiction; he would often cross the border into Canada to gamble away the workday at Casino Windsor, withdrawing substantial sums from the casino's ATM.  Tula frequently accompanied Suarez on these jaunts.  Ultimately, Suarez was never convicted of the bribery charges.  However, during the course of their investigation, the FBI uncovered other suspicious aspects of Suarez's dealings with the Gypsies, and from these come Suarez's two convictions currently on appeal.

In May and June 1994, Suarez had informed the Wayne County Prosecutor that he could identify the perpetrators of a series of utility repairman and roofing repair scams.  Suarez also identified the location of the criminal proceeds, and participated in a joint raid at "The Psychic Studio," various pawn shops and a safety deposit box at Comerica.  The material seized primarily consisted of jewelry -- some real, some false, some belonging to victims, some belonging to the Gypsies who fled the impending raid.  Suarez acquired custody of this jewelry, valued at over $100,000, and kept it for an extended period of time in a police evidence locker to which he had exclusive access.  Suarez claimed he was going to return the items to their true owners, and apparently did so with respect to some of the 299 pieces.  Suarez, at the Police Department's request, also had this material appraised.  However, the evidence tags Suarez placed on the items were defective, making it difficult for the DPD to use the internal procedures that normally tracked the disposition and custody of such items.  After he was asked to remove the jewelry from the evidence locker (which is usually used only briefly) Suarez took the jewelry to his home instead of to the DPD property room, the normal storage location for valuables in the possession of the DPD.  When Suarez was arrested, a

search warrant at his house turned up this jewelry ("the search warrant evidence") in a locked briefcase.

At some point, Suarez became involved in selling the search warrant evidence to Gypsies unconnected with the raid (mainly another Steve Miller, who calls himself "Cho-Cho,"a witness in this case from Chicago) and by pawning it in unconnected pawn shops. The earliest recovered pawn receipt showing Suarez receiving money based on his pledge of search warrant evidence is dated February 17, 1995. The total amount of conversion exceeded $5000, a point not contested. When, in early July 1997, one of the pawnshops that had had material seized attempted to recover some jewelry Suarez had already transferred, he apparently purchased similar-looking but cheaper replacements. The conversion of the search warrant evidence resulted in a conviction under 18 U.S.C. § 666(a)(1)(A). Suarez claims that, at worst, he converted the jewelry later on, not when he assumed control over it and put it in the evidence locker (as the indictment reads); this he deems to have rendered his conviction invalid as being unsupported by the evidence.

Publicity about Suarez's arrest also brought to light the story of Mr. Stanley Jakuszewski. Mr. Jakuszewski was an elderly Detroit-area man who had been befriended by a young Gypsy woman named Ann Morgan. Jakuszewski had been inveigled by Morgan to withdraw from his bank account some $40,000, with which Ms. Morgan subsequently absconded. Jakuszewski's son-in-law filed a complaint, and the case was assigned to Suarez. Suarez contacted Morgan and claimed the victim would settle for $28,000 (plus $2000 to Suarez). He then told Jakuszewski he could get him half his money back, $20,000. Morgan gave several cashier's checks to Suarez made out to Jakuszewski. Suarez delivered $20,000 worth of these, receiving a receipt from Jakuszewski which he altered to $28,000 and showed to Morgan. Suarez then cashed at least one of these checks (for $5000) by forging Jakuszewski's name as an endorsement in blank and converting the cash to his own use. This behavior resulted in the second conviction under 18 U.S.C. § 666(a)(1)(A).

minimal federal nexus is a necessary element of 18 U.S.C. § 666 in order to maintain the constitutionality of the statute.[9] *See Santopietro*, 166 F.3d at 93 (interpreting *Salinas*, 522 U.S. at 60-61). *Cf. United States v. Corp*, 236 F.3d 325 (6th Cir. 2001) (rejecting, with regard to 18 U.S.C. § 2252(a)(4)(B), a claim of facial unconstitutionality, but finding a meaningful jurisdictional requirement was constitutionally required, and that this jurisdictional element had not been satisfied as to criminal defendant). Given the facts as they have been presented to us, it would appear this element is not satisfied, indicating Suarez is probably innocent under the above construction of 18 U.S.C. § 666. Although we have rejected as a basis for relief the idea that the Government was "out to get" Suarez, he is currently in federal prison for acts of malfeasance in which the federal government has apparently no constitutional interest. Allowing him to remain there, while largely believing that his prosecution – for the particular offenses of which he was convicted – was beyond the power of Congress, would certainly seem to call into question the fairness of the judicial process.

To sustain Suarez's conviction would make § 666 a generalized "anti-corruption statute under the spending power." *McCormack*, 31 F. Supp. 2d at 186 (criticizing this

---

[9]*But see Morgan*, 230 F.3d at 1073 (Bye, J., concurring) (rejecting in dicta the addition of a "'nexus' element . . . to resuscitate § 666" because "Congress lacks the power under the Spending Clause to enact criminal laws governing third-party conduct"). There is nothing in *Salinas* or *Fischer* or current Spending Clause jurisprudence that suggests Judge Bye's view commands a majority on the Supreme Court. By contrast, there is considerable evidence that a more limited skepticism of Congressional power, one which constitutionally interpolates a nexus requirement into § 666, has majority support on the Supreme Court. Since this evidence surely derives in part from *Fischer*, I am puzzled why this case does not call into question certain aspects of *Dakota*. Put more simply, had *Dakota* been decided after *Fischer* as well as after *Salinas*, would it have so easily stuck with the holding of *Valentine*? Only if we can confidently answer in the affirmative should we treat it as binding, and given *Dakota's* own language, I lack that confidence.

federal connection between his conversion and federal funds, his claim might well fail, because the fact-based inquiry has not been done, and the error, if any, might not be plain. However, if the error is deemed the absence of any jurisdictional showing of *some*, albeit minimal and indirect, connection between Suarez's crimes and federal funds, which now appears required as a matter of federalism, then it appears that an error has occurred (under current law), and that the error is plain. The Supreme Court has rejected the blanket application of § 666 to all criminal conduct by recipient organizations in *Fischer* and the weight of post-*Salinas* appellate authority has recognized the need for a connection. Crucially, even our decision in *Dakota* suggested the possibility that such a requirement was waiting to be delineated by further caselaw. Although my brothers disagree, I would find *Dakota* a sufficiently "open ruling" (in contrast to the earlier and less equivocal *Valentine*) that we are no longer bound by its holding of "no nexus requirement" in light of *Fischer*.

This becomes particularly relevant because the United States, in an interesting gambit, claims "[t]here is not even an analytical approach by which federal funds could be traced to the transactions at issue in this case . . . ." (Gov't Br. at 37). Hypothetically, the potential financial liability of the DPD for Suarez's conversions might have had some sort of impact on the integrity or operation of the D.A.R.E program; this showing, of course, is quite unlikely. Especially given the government's admissions here on appeal, there is a strong possibility that Suarez would win any such inquiry into nexus, with the prosecution unable to show how his acts have affected the integrity of the D.A.R.E program. Therefore, the absence of any consideration of this issue substantially prejudiced Suarez, satisfying the third requirement for plain error review.

The final element of plain error review asks, before we exercise our discretion, whether this error had a serious effect on the integrity and fairness of the proceedings. According to the view given above, the jurisdictional requirement of

Both this conviction and the one above are premised on the idea that Suarez took property (evidence and restitution payments) from the Dearborn Police Department, an organization receiving federal funds (for its D.A.R.E. program). Suarez did not challenge this connection below but now claims on constitutional and statutory grounds that his offenses have too tenuous a relationship to the money of the United States to support a federal charge under § 666.

The expanded inquiry (and the failure of plea negotiations) had resulted in an expanded superseding indictment, filed on May 21, 1998. Along with the above mentioned conversions and the original bribery charges, the government alleged seven money laundering counts based on Suarez's turning the jewelry into pawn shop cash, bank fraud based on the forged endorsement of Morgan's cashier check, and 109 violations of the Travel Act, 18 U.S.C. §1952, based on his withdrawals from ATMs in Canada. In addition, his Canadian trips brought another charge: of misappropriating his own services and the use of his police vehicle. The government later dismissed the Travel Act violations and amended the superseding indictment accordingly on November 24, 1998. The defendant points to these additional charges as evidence of prosecutorial vindictiveness against him.

Pre-trial, Suarez attempted unsuccessfully to suppress statements he made at the time of his arrest. When he was first confronted by the FBI at the Dearborn Police Station on October 1, 1997, Suarez was offered assistance by the president of the local police union, Corporal Huck. Huck informed Suarez that he was getting a police union lawyer for him. Suarez said: "Okay." Huck then called attorney Peter Cravens and arranged for him to meet Suarez at FBI headquarters in Detroit. Before the FBI took Suarez away, Huck told the defendant that an attorney would be there when he arrived. Subsequently, Suarez was, in this order, given his Miranda warnings and written Waiver of Rights, which he signed, asked during his ride to Detroit if he wished to speak, and responded that "Yes, I want to clear this up." On his ride downtown, Suarez discussed the payments he received from

Nancy Miller and matters surrounding the criminal investigation of her relatives. He later moved to exclude these statements as having been taken in violation of his right to counsel. The district court ruled Suarez had not asserted his right to counsel and denied the motion. He appeals this denial.

Later on in October 1997, Suarez and his union attorney Cravens, apparently in the hopes of a resolution of his case, engaged in a 15-hour debriefing on Suarez's activities as a criminal investigator. This proffer was made under a grant of limited immunity, in place of a hearing pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972). The government's use of Suarez's information was governed by an agreement signed by all parties. Although the information could be disclosed to the court or probation department, it was not to be used to affect Suarez's sentence. This proffer appears to be the source of many colorful details in the pre-sentence report of the seamier side of Romany life in Dearborn, revolving around the various alleged schemes of Tula, his wife, and others.[3] In these stories, Suarez plays an ambiguous role, resolving criminal complaints while allegedly getting a "piece of the action." This material in the PSR is stated under the category "offense behavior not part of relevant conduct," and was not used in sentencing the defendant. Below, Suarez contested the use of this information as nonetheless in violation of the proffer agreement, since it supposedly biased the pre-sentence writer against him. His claim was denied and he apparently does not now directly reassert it, although he claims it is further evidence of prosecutorial vindictiveness.

At trial, Suarez was acquitted of all charges save the two charges of unlawful conversion detailed above. His sentence

---

[3]For instance, the pre-sentence report describes a fraud in which victims are told that money is the root of all evil, and because their money is generating negative vibrations that curse their life, it must be given to the "psychic" to be prayed over and cleansed. The cash is, however, not returned. This particular fraud has been perpetrated since medieval times.

other "exceptional cases or particular circumstances." *Chesney*, 86 F.3d at 567-68. Generally, the question must be a purely legal one that has been fully briefed by both parties. *See ibid.*; *United States v. Real Property Known and Numbered as 429 S. Main St., New Lexington, Ohio*, 52 F.3d 1416, 1419 (6th Cir. 1995). It is also important that the matter be one that the appellant did not have available to him below. *See Chesney*, 86 F.3d at 568; *429 S. Main St.*, 52 F.3d at 1419. *But see Hayes*, 218 F.3d at 621 (reviewing Confrontation Clause claim that could have been raised but was not). If the claim is accepted for review, it appears that plain error analysis will apply. *See Hayes*, 218 F.3d at 622 ("assuming that the appropriate standard of review is the 'plain error' standard of Rule 52(b) . . . .").

I would exercise our discretion to consider Suarez's argument. Both parties have briefed this issue, and it is (or can be taken as) a purely legal question. Although it could theoretically have been raised below by zealous counsel, the legal landscape has changed significantly in Suarez's favor since the time of the trial, with governing authority being available only since the decision in *Fischer* in May 2000, and strong persuasive authority only since *Zwick* in December 1999. *Valentine* governed the Sixth Circuit during Suarez's trial and the cryptic remarks in *Salinas* regarding nexus were insufficient to abrogate obviously its conclusion that no relationship need be shown. Thus Suarez's default can be seen as minimal. *Cf. Mayhew v. Allsup*, 166 F.3d 821, 823 (6th Cir. 1999) (holding civil litigants excused from failure to assert a new statute when that statute was enacted after summary judgment was entered against them, and only eight days prior to the district's order rejecting their motion to alter or amend judgment).

A plain error exists when: (a) an error occurred in the district court; (b) the error was plain; (c) the error affected the defendant's substantial rights; and (d) the error "seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States v. Owusu*, 199 F.3d 329, 339 (6th Cir. 2000). If Suarez's claim is that there is an insufficient

federal program, [otherwise] § 666 would criminalize routine acts of fraud or bribery[,]" a result he believed that the majority would find unconstitutional. *Id.* at 689 n.3 (Thomas, J., dissenting) (emphasis in original).[7] Given *Fischer*, it is no longer tenable to hold to the proposition that no connection whatsoever need exist between the federally punished criminal conduct and the federal interest in the programs supported by the funds used to satisfy § 666(b).

Suarez did not raise these federalism concerns in the trial court.[8] Normally, this would preclude appellate consideration of the issue. *Foster v. Barilow*, 6 F.3d 405, 407 (6th Cir. 1993). However, this rule is one of prudence, not jurisdiction, and the court has discretion to examine the issue under certain conditions. *United States v. Hayes*, 218 F.3d 615, 619 (6th Cir. 2000); *United States v. Chesney*, 86 F.3d 564, 567-68 (6th Cir. 1996) (constitutional claim under Commerce Clause held reviewable, although defendant had not raised it below). Under Fed. R. Crim. P. 52(b), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The discretion of the appellate court may be exercised when the bar against review would produce a "plain miscarriage of justice" or in

---

[7] On a broader level, there has been closer scrutiny recently of the jurisdictional prerequisites for federal regulation of local criminal conduct. *See United States v. Lopez*, 514 U.S. 549, 561 (1995); *United States v. Morrison*, 529 U.S. 598, 617-19 (2000). Unlike the statutes at issue in *Lopez* and *Morrison*, 18 U.S.C. § 666 is based on the Spending Clause, rather than the Commerce Clause, of the Constitution. Nonetheless, the federalism concerns are equally present because the reservation of a "generalized police power to the States is deeply ingrained in our constitutional history." *Morrison*, 529 U.S. at 619. It would be quite problematic were Congress to be able to evade constitutional restrictions on its criminal lawmaking authority over local officials through means of the Spending Clause. *See* George D. Brown, *Stealth Statute -- Corruption, the Spending Power, and the Rise of 18 U.S.C. § 666*, 73 NOTRE DAME L. REV. 247, 298 (1998).

[8] Although his original brief on appeal claimed he had done so in a pre-trial motion, his counsel now admits this did not occur. (Suarez Reply Br. at 10).

was enhanced for abuse of public trust, the presence of a vulnerable victim (Mr. Jakuszewski), the value of the items involved, and his more than minimal planning. None of these sentencing decisions are appealed here. The total offense level was 19, and Suarez was sentenced at the top of the resulting range, 37 months in prison for each count, served concurrently. Tula Miller pled guilty to a bribery count, and received a downward departure under USSG § 5K1.1, resulting in a sentence of 24 months.

## II

### *Standard of Review*

As to whether there was a sufficiency of evidence on the conversion of the search warrant evidence, we assess whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In considering the evidence, we allow the government the benefit of all reasonable inferences and refrain from independently judging the weight of the evidence. *See United States v. Welch*, 97 F.3d 142, 148 (6th Cir. 1996).

The defendant agrees that the standard for the review of a district court's denial of a motion to dismiss an indictment on grounds of prosecutorial vindictiveness is for abuse of discretion, based on similar prosecutorial misconduct cases. In the past we have also adverted to the "clearly erroneous" standard in evaluating the district court's finding of no vindictiveness. *See United States v. Sammons*, 918 F.2d 592, 601 (6th Cir. 1990) ("defendant has not directed our attention to anything on the record that would cause us to question the district court's findings, much less find them clearly erroneous").

We review for clear error a refusal to suppress evidence based on a claimed constitutional violation. "When considering the district court's ruling on a motion to suppress,

we review the district court's factual findings for clear error. . . . The reviewing court is to review the evidence in the light most likely to support the district court's decision." *United States v. Roark*, 36 F.3d 14,16 (6th Cir. 1994) (citation omitted). The district court's conclusions of law are reviewed *de novo. See ibid.*

Normally, because Suarez's challenge to the constitutionality of the application of § 666 involves questions of law, our review would be de novo. A constitutional challenge to a statute is a question of law, which this court reviews de novo. *United States v. Smith*, 182 F.3d 452, 455 (6th Cir. 1999). This is also our standard if Suarez's challenge is interpreted as involving statutory construction. *See United States v. Wuliger*, 981 F.2d 1497, 1501 (6th Cir. 1992). However, "[d]ue respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000). Moreover, because the issue was not raised and considered below, our inquiry is for plain error. *See United States v. Hayes*, 218 F.3d 615, 619-20 (6th Cir. 2000).

### III

*Sufficiency of Evidence for Conversion of the Search Warrant Evidence*

The second count of the amended superseding indictment, under which Suarez was convicted of converting the jewelry taken from "The Psychic Studio," reads as follows, in relevant part: "In or about, June, 1994, said date being approximate . . . Defendant . . . caused Investigator Francis Heaney to turn over the Search Warrant Evidence . . . by telling Heaney that SUAREZ would return the Search Warrant Evidence to its true owners . . . . By taking possession of the Search Warrant Evidence in that manner, Defendant SUAREZ converted it to his own use in that he never used it nor intended to use it as evidence . . . nor did he ever intend to return it or attempt to return it to the true owners." Suarez, of course, maintains that

see" *Dakota* in distinction to *Santopietro*, *Phillips*, and *Zwick*).

More relevant for the case at hand, the Supreme Court, while not resolving all doubts, has recently (since briefs were filed in this case) given me reason to believe that the broader holding of *Dakota* has been undermined by *Fischer v. United States*, 529 U.S. 667 (2000). Fischer had defrauded the West Virginia Health Authority, a participant in the Medicare program. The Court upheld his conviction under § 666(a)(1)(A), but "without endorsing the Government's broader position" that the receipt of federal funds alone was enough to satisfy the definition of "benefits." *Id.* at 677. While holding that the "Government has a legitimate and significant interest in prohibiting financial fraud or acts of bribery being perpetrated upon Medicare providers," *id.* at 1789, the Court explicitly noted that "[o]ur discussion should not be taken to suggest that federal funds disbursed under an assistance program will result in coverage of all recipient fraud under § 666(b)." *Id.* at 681 (stating this "would turn almost every act of fraud or bribery into a federal offense, upsetting the proper federal balance"). The Court then went on to recommend a fact-based inquiry into the "program's structure, operation, and purpose" to determine whether the criminal conduct posed a threat to the integrity of the federal program. *Id.* at 681-82. If it does pose such a threat (as was found with defendant Fischer's conduct), then the statute may be applied constitutionally, regardless of whether the federal funds are affected directly.

Admittedly, the question in *Fischer* turned on a somewhat different issue, on whether to characterize certain forms of federal aid as "benefits." However, the *Fischer* majority's language regarding the need to respect the proper balance between state and federal sovereigns makes clear their constitutional concerns with a broad reading of § 666. As Justice Thomas, (who argued with Justice Scalia for an even narrower definition of "benefits") pointed out, jurisdictional restrictions are required to "ensure that in *each* case the exercise of federal power is related to the federal interest in a

defendant's offense conduct"). The Second Circuit, while affirming a conviction, stated that the statute was constitutional as applied only because the bribe was "'a threat to the integrity and proper operation of the federal program.'" *United States v. Santopietro*, 166 F.3d 88, 93 (2nd Cir. 1999) (quoting *Salinas*). *Santopietro* implied that there was a federal interest requirement, stating that it "would not permit the Government to use section 666(a)(1)(B) to prosecute a bribe paid to a city's meat inspector in connection with a substantial transaction just because the city's parks department had received a federal grant of $10,000." *Ibid.*

The Fifth Circuit formulated its "jurisdictional" restriction on a slightly different principle, but with similar results, by assessing the extent to which the defendant is an "agent" with regard to federal funds, and focusing on "how organizationally removed the employee is from the particular agency that administers the federal program." *United States v. Phillips*, 219 F.3d 404, 411 (5th Cir. 2000). Similar to the Second and Third Circuits, it concluded that "although the conduct prohibited by section 666 need not actually affect the federal funds received by the agency, there must be some nexus between the criminal conduct and the agency receiving federal assistance." *Id.* at 413-14 (citation omitted) (characterizing the positions of the Second and Third Circuit as being in "a similar vein.")

The *Zwick* court seemed to disagree with our post-*Salinas* holding in *Dakota*, *see* 199 F.3d at 686, although this disagreement was only partial. *Dakota* speaks of not requiring a "direct" link, but goes on to state that "the nature of any necessary connection is left unanswered" by the Supreme Court. 197 F.3d at 826. However, *Dakota* went on to state more broadly that "the district court correctly ruled that 18 U.S.C. § 666 does not require a nexus between the alleged bribes and the federal funding received by [the agency]." *Ibid.* This has been cited as being in opposition to the conclusions of our sister circuits. *See United States v. Morgan*, 230 F.3d 1067, 1069 (8th Cir. 2000) (citing "but

this indictment is not true, since he was just doing his job during June 1994, although *later on,* he started stealing pieces of the jewelry. At the close of the evidence, the jury was instructed on conversion: "Conversion differs from stealing in that one who gains possession of property by taking it from another steals, while one who comes into possession of property by lawful means, but afterwards exercises the rights of ownership to the exclusion of the owner's rights and without the owner's authorization commits conversion." There was no instruction as to when the criminal intent must have been present in order to sustain the charge.

Suarez's challenge to his conviction on this count is somewhat scattershot, but seems to be that there was insufficient evidence for a rational jury to convict under either the description of the conversion in the indictment or the conversion described by the jury instructions. Alternatively, he claims that if a jury could have found that his behavior was criminal under the jury instructions, the jury instructions were at sufficient variance from the indictment as to constitute an impermissible constructive amendment.

Evaluating only the indictment itself, Suarez's argument essentially claims that criminal intent must exist at the moment of an act for that act to be punishable, and that the court is confined by the indictment to look at the single act of taking the property from Detective Heaney and putting it in an evidence locker. It is true that the indictment can be read as asserting that the prosecuted act of conversion took place when Suarez allegedly lied to Heaney in order to get control or lawful possession of the property, with his knowing conversion being essentially a larceny by trick. *King v. Pear*, 168 Eng. Rep. 208, 209 (Cr. Cas. Res. 1779) (discussed in *Bell v. United States*, 462 U.S. 356, 359 (1983)). Where the criminal intent to steal is absent, the act is not criminal under the federal law of property crime. *See Morrissette v. United States*, 342 U.S. 246, 255 (1952); *United States v. Bess*, 593 F.2d 749, 752 & n.2 (6th Cir. 1979) (interpreting parallel provision of 18 U.S.C. § 641).

Hence, Suarez would need to show, at a minimum, that there was insufficient evidence for a reasonable jury to find he was deceiving Heaney about his plans in the Spring 1994. Probably the indictment could be read as being somewhat over-general, in suggesting that Suarez planned to steal all of the jewelry. Given the evidence on his later behavior and mode of operation, this is unlikely. People did know about the jewelry, after all, and Suarez could hardly have walked off with it without consequences. However, a jury could have found that Suarez, even as early as his taking it from Heaney, had plans to extract surreptitiously from the haul at least $5000 in value for himself, by applying to some items such techniques as substitution of cheaper for more expensive pieces, or by false claims of returns to owners. Suarez stored the material in an unorthodox manner that resulted in him having sole access to it, and he used evidence tags that referred to nonexistent pages in police department property records. All of this behavior, closely proximate to his initial taking of the property, shows a suspicious desire on the part of Suarez to avoid official supervision and tracking of what he did with these valuables. This provides a bridge between his undisputed later sales and pawns of some jewelry and his initial acquisition from Heaney, and a reasonable jury could have concluded that the intent to get something for himself if possible was present at the earlier time.

The defendant raises two points to rebut these suspicions. First, he notes that he carried out a DPD-ordered appraisal of the jewelry seized in the raid. Second, he notes that he always "secured" the property. Neither of these points makes unreasonable a jury finding of criminal intent beyond a reasonable doubt. If Suarez was considering what to convert, he needed an accurate appraisal as much if not more than did the DPD. If he was treating the property as his own, it was only logical that he would keep track of it – indeed a reasonable interpretation of Suarez's scheme is that it involved keeping better track of the jewelry than did the DPD – and that he would prevent other people from stealing it.

not consider whether the statute requires some other kind of connection between a bribe and the expenditure of federal funds . . . ." 522 U.S. at 59. *See also id.* at 61 ("Whatever might be said about § 666(a)(1)(B)'s application in other cases, the application of § 666(a)(1)(B) to Salinas did not extend federal power beyond its proper bounds."). This was largely the state of the law at the time Suarez was prosecuted.

Suarez was convicted on December 10, 1998; his last motion to dismiss was filed on November 16, 1998. This motion was for prosecutorial vindictiveness; his earlier motion to dismiss for insufficiency of the evidence had been rejected on September 9. On November 25, 1998, the United States District Court for the District of Massachusetts decided *McCormack*, on which Suarez now relies, *inter alia*. McCormack had been bribing a police officer in Malden and was prosecuted under 18 U.S.C. § 666(a)(2). 31 F. Supp. 2d at 179. The Malden police force received D.A.R.E funds (of $20,000), and $200,000 in other federal funds for community policing and other programs. *See id.* at 178. The district court found that there was "little or no relationship between the bribery and the federal program conferring jurisdiction." *Id.* at 186. It dismissed the charges, holding that some sort of connection, although it need not be direct, was required for the statute to be constitutional as applied. *See id.* at 189. In so ruling, the *McCormack* court interpreted *Salinas* as having "intimated, as other courts and scholars have done, that any other interpretation of § 666, one that does not require a federal connection at all, could well be unconstitutional . . . ." *Id.* at 185.

Since Suarez was convicted, at least three circuits have also indicated that some effect of the corruption on federal interests must be shown. The Third Circuit, in an extensively reasoned opinion, vacated the bribery conviction of a Township Commissioner where his influence peddling had no connection to township projects funded by the federal government. *United States v. Zwick*, 199 F.3d 672, 687 (3d Cir. 1999) (stating that "we hold that § 666 requires that the government prove a federal interest is implicated by the

basis, the statute also requires that the "organization, government, or agency [involved] receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(b). Suarez also does not contest that the agency for which he worked, the Dearborn Police Department, received $10,000 during the relevant period, and that the larger encompassing entity, the City of Dearborn, received significantly more money.

Suarez's argument is, rather, that the property he took does not bear any relationship whatsoever to the federal money the DPD received and therefore the statute should not apply to his acts. In his reply brief, he clarifies that this claim is a constitutional one, (Suarez Reply Br. at 11), presumably because he argues that the extension of federal jurisdiction over acts such as Suarez's would exceed the power of Congress. *Cf. United States v. McCormack*, 31 F. Supp. 2d 176 (D. Mass. 1998) (cited by Suarez) (dismissing indictment under 18 U.S.C. § 666 on these grounds).

The Supreme Court's position on the ability of 18 U.S.C. § 666 to reach all corruption in local and state agencies (the "federal recipient") is not altogether clear. A defendant under 18 U.S.C. § 666 need not be shown to have actually stolen any of the federal funds given to the "federal recipient" or even that his malfeasance affected those federal funds. *United States v. Salinas*, 522 U.S. 52, 55-58 (1997) (rejecting a constitutional claim against § 666 as generally exceeding the limits of federal power). We have described the statute as requiring "no relationship" between the stolen property and the federal funds of the recipient, *United States v. Valentine*, 63 F.3d 459, 464-65 (6th Cir. 1995), and more recently as requiring "no direct link." *United States v. Dakota*, 197 F.3d 821, 826 (6th Cir. 1999). However, *Salinas* left open the possibility that some connection would be required: "We need

_____

where money intended for government was not yet government property).

Even if one were to argue that, under the most constricted view of the indictment, a rational jury could not have failed to find reasonable doubt of Suarez's initial criminal intent, a rational jury certainly could have failed to find reasonable doubt under the charge as interpreted during the jury instructions, which were a permissible variance from the original indictment. Conversion, as used in the statute and developed in the jury instructions, is a broader concept under the federal criminal law than is larceny, in that it reaches behavior where "initial possession by the converter was entirely lawful." *Morrissette*, 342 U.S. at 272. It is certainly arguable that Suarez is better or more certainly characterized as an embezzler. By using the term "conversion" without limiting it to a particular moment, the jury instructions and the evidence presented by the prosecution encompassed this possibility. Given the testimony of Cho-Cho Miller, the documentary proof of the pawn slips giving money to Suarez for his pledges of police evidence, and the other proof brought forward at trial, his "knowing conversion" of the jewelry at some point is amply supported, and is indeed hardly contested. The question is instead whether the use by the jury of this standard constitutes a constructive amendment of the indictment unfair to Suarez.

We have articulated a two-part test for finding a constructive amendment requiring reversal of a conviction: a variance between indictment and jury instructions, and prejudice to a substantial right of the defendant. *United States v. Prince*, 214 F.3d 740, 757 (6th Cir. 2000). As in *Prince*, defendant appears to have demonstrated the existence of a variance. The indictment makes much of Suarez's deception of Heaney as constituting the act of conversion, while the jury instructions make nothing of it. Moreover, defendant makes a plausible claim that it was to the prosecution's advantage to push the act of conversion back to the earliest possible moment. For the money laundering charges, the prosecution needed to show two acts, of theft and then of an attempt to conceal the proceeds of the theft (through pawning); hence it is not unreasonable to think that the prosecution intentionally indicted on an "early conversion" theory rather than one

which would have encompassed the obvious conversion at the moment Suarez pawned the jewelry.

However, also as in *Prince*, this variance did not affect the substantial rights of the defendant and so does not allow reversal of the conviction. The "key question," as *Prince* saw it, was whether the jury instruction and evidence introduced another crime or an "alternative method[] by which the one crime . . . could have been committed." 214 F.3d at 758 (upholding instruction describing alternative method for money laundering). *See also Martin v. Kassulke*, 970 F.2d 1539, 1543 (6th Cir. 1992) (upholding instruction describing alternative method for rape). Suarez was charged with knowing conversion of the jewelry and the indictment gave notice to both the trial court and to him of the charge he faced. *See Prince*, 214 F.3d at 758. The indictment claims "SUAREZ converted it" and the statute punishes he who "embezzles, steals, obtains by fraud or otherwise without authority knowingly converts . . . ," showing, as noted above, that the language of conversion covers a multitude of offenses, including embezzlement. *Cf.* 18 U.S.C. § 666(a)(1)(A). Although the indictment indeed suggests a method by which this conversion happened, neither it nor the statute confines itself to punishing a larceny by trick. The jury instructions, by describing conversion generally, may have opened up the possibility in the jury's mind that the conversion was accomplished by something more akin to embezzlement. It is even arguable that they did find this was what Suarez did, since he was acquitted of money laundering. But under the statute, embezzlement is not a crime *alternative* to the one charged, but simply another of a number of types of knowing conversion. Although, as discussed above, a jury could have found the evidence sufficient under either theory, Suarez's defense would not, under our case law, have been prejudiced by the variance.

necessarily have understood this as deferring all police questions until arrival. A reasonable police officer could have interpreted the events to mean that Suarez had not yet made a choice as to whether to deal with police *exclusively* through counsel.

Furthermore, even if an error were found it would be harmless, because the evidence Suarez gave on his long ride with the FBI related primarily to his bribery charge and his dealings with Nancy Miller; it apparently had nothing to do with the search warrant evidence, to say nothing of Jakuszewski's checks. If there was an error, the effect of this error is judged by looking at what effect the wrongly included evidence "had or reasonably may be taken to have had" on the jury's decision. *Kyger*, 146 F.3d at 382. The evidence was unrelated to the convictions here appealed and so could have had no effect on them. Since the jury acquitted Suarez of bribery, they appear to have given some credence to his version of the events surrounding the bribery charge. There is no sign that his statements taken in the FBI cruiser were generally so damaging to him as to have had a "substantial and injurious effect or influence in determining the jury's verdict, " *ibid.*, on Suarez's other charges. His conversion convictions appear to have been based on clear documentary evidence of his misdeeds, tracing the misappropriation of the proceeds of the property converted.

## VI

*Lack of a Sufficient Nexus Under § 666 to Federal Funds*

The statute under which Suarez was convicted requires that the property converted was under the "care, custody or control" of a local government agency. 18 U.S.C. § 666(a). Suarez does not contest that the search warrant evidence and Jakuszewski's checks were such property.[6] As a jurisdictional

---

[6] This removes any argument he might have that the property is not potentially under jurisdiction of the statute. *See United States v. Klingler*, 61 F.3d 1234, 1241 (parallel statute of 18 U.S.C. §641 held inapplicable

On the other hand, Suarez never told the police directly of his "desire to deal with the police only through counsel." In this respect his case is similar to that of Doherty. Doherty informed the FBI that his mother was going to retain an attorney for him, but he never invoked his right to counsel. *Doherty*, 126 F.3d at 774. The mere fact that the government is aware that a suspect has an attorney, or is soon to have one, does not unambiguously assert the suspect's right to deal exclusively with the police during custodial interrogation. *See McNeil*, 501 U.S. at 177-182. *Cf. United States v. Thompson*, 35 F.3d 100,104 (2d Cir. 1994). It is also relevant to note that the FBI could have expected Sgt. Suarez to know what he was doing when he signed the *Miranda* waiver form, and when he decided to "clear this up" by responding to the FBI's inquiry regarding whether he wanted to talk. If Suarez's "OK" can be construed as ambiguous, then the interrogation was proper. Although pointing out that it perhaps would have been better police practice to have asked "would you like to talk to us without counsel" instead of (as happened) simply "[w]ould you like to talk to us," the Supreme Court has declined to *require* such clarification: "if the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Davis*, 512 U.S. at 461-62.

We agree with the district court that Suarez's mere acknowledgment of Huck's actions is not an "unequivocal request for counsel." The cases following *Edwards* repeatedly refer to the need for the suspect to make some affirmative "statement" or "request" whose ordinary meaning shows his desire to deal with the police through counsel. *See McNeil*, 501 U.S. at 179 (directing attention at the "ordinary meaning" of suspect's statement); *Boyles v. Foltz*, 816 F.2d 1132, 1135 (6th Cir. 1987) (using this rule). *Davis* directs us to look at whether "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." 512 U.S. at 459. The FBI could have understood Suarez's "OK" to indicate that he was aware that there was going to be counsel present when he arrived at FBI headquarters, but a reasonable police officer would not

## IV

### *Prosecutorial Vindictiveness*

We have held that in order to show vindictive prosecution there must be (1) exercise of a protected right; (2) a prosecutorial stake in the exercise of that right; (3) unreasonableness of the prosecutor's conduct; (4) the intent to punish the defendant for exercise of the protected right. *See Nat'l Eng'g & Contracting Co. v. Herman*, 181 F.3d 715, 722 (6th Cir. 1999). Presumably, if the first three elements are present, this may help establish grounds to believe the fourth is present, that there is the required "realistic likelihood of vindictiveness," which the government would have to rebut. *See Bragan v. Poindexter*, 249 F.3d 476 481-82 (6th Cir. 2001) (*citing United States v. Andrews*, 633 F.2d 449, 453-56 (6th Cir. 1980) (en banc)). Since *Andrews* remains good law in the Sixth Circuit, prosecutorial vindictiveness can potentially be found in the pre-trial addition of charges following pre-trial assertions of protected rights. 633 F.2d at 454. However, if the charges are brought simply as the result of failure of the plea bargaining process, they are not vindictive. *Id.* at 456 (following *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) (finding not vindictive a superseding indictment bringing additional charges, filed after a failure of plea bargaining)).

In order to satisfy the first element of this test, Suarez must therefore show more than that he chose not to accept a plea bargain on bribery, the only charge he faced at that point, and instead chose to assert his right to trial. Although the right to a trial by a jury of one's peers is a highly protected right, asserting this right by rejecting a plea bargain is not enough to provide evidence of an improper motive on the part of the prosecution. Suarez claims he was planning to file motions to suppress his statement and to dismiss the charge and that these provided the motivation for the addition of other charges, thus allowing him to fall into the ambit of *Andrews*, where the defendants' appeal of a bail denial may have been behind augmentation of the charges against them. *See* 633

F.2d at 454 n.5. Since Suarez had a right to file these motions, arguably he has satisfied the first element of his claim.

However, Suarez cannot show the prosecution had any particular "stake" in preventing the assertion of these rights. These motions were not particularly exceptional in the course of the trial; "a defendant before trial is expected to invoke procedural rights that inevitably impose some 'burden' on the prosecutor." *United States v. Goodwin*, 457 U.S. 368, 381 (1982). "It is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter." *Ibid.* In *Andrews*, the government could have had an independent stake (protecting its witness from defendants' potential retaliation were the defendants released) in augmenting the charges to assure the defendants would not be released on bail, quite apart from the burden of litigating the motion. In the precedent on which *Andrews* extensively relied, *Blackledge v. Perry*, 417 U.S. 21 (1974), the prosecution could have been attempting to avoid the burden of a complete retrial of the case. Here, the additional burden on the prosecution from the motions in proportion to the burden for the upcoming trial itself is rather minimal. This tends to show that the real "gain" the prosecution sought was avoiding the trial, not the motions ancillary to the trial, and avoidance of trial as a prosecutorial stake is implicit in the plea bargaining process, and therefore exempt under *Bordenkircher* from being held vindictive.

Suarez is also unable to show that the district court abused its discretion in finding the prosecutor's actions not unreasonable, at least as to the charges on which Suarez was convicted. First, the mere presence of a superseding indictment bringing additional charges is not sufficient to be presumptively unreasonable. *See Goodwin*, 457 U.S. at 380. *See also United States v. Wells*, 211 F.3d 988, 1002 (6th Cir. 2000) (upholding superseding indictment). Generally, a potentially vindictive superseding indictment must add additional charges or substitute more severe charges based on the same conduct charged less heavily in the first indictment.

## V

### *Fifth Amendment Right to Counsel.*

After a defendant has requested the assistance of counsel, custodial interrogation cannot be initiated by the police; the admission of statements taken in violation of this rule is unconstitutional. *See Edwards v. Arizona*, 451 U.S. 477, 484 (1981); *Kyger v. Carlton* 146 F.3d 374, 379 (6th Cir. 1998). However, the request for assistance must be unambiguous to trigger this protection. *See Davis v. United States,* 512 U.S. 452, 459 (1994). Moreover, the request cannot be for just any sort of assistance, but for "the particular sort of lawyerly assistance that is the subject of *Miranda*." *McNeil v. Wisconsin*, 501 U.S. 171, 179 (1991). *See also United States v. Doherty*, 126 F.3d 769, 775 (6th Cir. 1997), *partially abrogated on other grounds*, *Texas v. Cobb*, 121 S.Ct. 1335, 1341 n.1 (2001). This sort of assistance under the Fifth Amendment has been described as indicating the suspect's "desire to deal with the police only through counsel." *Edwards*, 451 U.S. at 484; *Doherty*, 126 F.3d at 775.

Suarez claims his statements, made in the FBI cruiser in the afternoon of October 1, 1997, were taken in violation of *Edwards*. The interrogation was initiated by the FBI, and the first question they asked, "Do you want to talk?," although giving Suarez an option, was not obviously a clarifying question about Suarez's equivocal assertion of right, as permitted by *Davis*. *See* 512 U.S. at 461-62.[5] The FBI officers in the car (or at least some of them) knew defendant had "okayed" representation by the union attorney for his interrogation on these particular matters at FBI headquarters.

---

[5] The district court assumed that Lt. Strutz of Internal Affairs heard Huck's offer of an attorney inside the DPD. This knowledge would normally be imputed to other state actors, even though they claimed to not have heard the offer at that point. The district court also found that Suarez did indeed say "OK," but found that this did not constitute expressly asking for an attorney.

be overwhelmed by the lengthy indictment padded with weak charges and become biased against a defendant (although citing no precedent for this); however, the issue is equally moot, since the Travel Act charges were dismissed prior trial and any supposed effect they might have had remains in the realm of psychological speculation.

Beyond the Travel Act complaints, Suarez points to a number of other problems, none of them notably serious or rising to the level of a constitutional violation. His complaints about the use of his proffered testimony, for instance, are meritless. The agreement he signed allowed the probation office to hear the material. The agreement forbade it from being used in sentencing Suarez and it was not, nor was it used as a basis for further prosecution, which meant in effect that Suarez got off scot-free for a good deal of suspicious activity. Since the defendant admits this "Kastigar issue" to have been "effectively mooted,"(Suarez Br. at 21), he has in effect abandoned this claim.

Ultimately, in a view reiterated at oral argument, Suarez tries to shoehorn all his complaints (the new indictments, the use of his proffer, and the taking of his statement outside the presence of counsel, discussed *infra*) into a showing that he was prosecuted "vindictively," by which Suarez appears to mean the United States was "out to get him," or liked him less than United States Attorneys and the FBI normally like criminal defendants or corrupt policemen. But this is all misplaced, since the vindictive prosecution doctrine is designed to prevent retaliation for the assertion of protected rights, not to police the emotions of prosecutors.

---

money laundering charges were non-frivolous and bringing them was within the prosecutor's discretion.

*See Andrews*, 633 F.2d at 453. Where, by contrast, there were multiple criminal acts, the addition of further charges is more reasonable. *See ibid.* If the prosecution can show that the additional charges were not brought earlier because they were based on new evidence, it will successfully rebut a showing of vindictiveness. *See id.* at 456 & n.10.

Clearly the superseding indictment was based to some extent on evidence unavailable at the time of the first indictment. The jewelry and pawn tickets that formed the basis of Suarez's first conversion count and his money laundering counts were not discovered until after his arrest. Evidence of his trips to Windsor, and of his scheme with Jakuszewski's restitution, were also discovered later. Although a significant amount of the physical evidence was discovered prior to Suarez's indictment on November 26, 1997, the government plausibly claims that it needed time to unravel the tangled relations among Suarez, the Gypsies, and property in the putative care of the Dearborn Police Department.

Defendant does not contest that a superseding indictment bringing additional charges was appropriate – the question is when it was brought and what it contained. It seems apparent that the government was holding some charges in abeyance as an inducement during plea bargaining. As defendant admits, "prosecutors were threatening this defendant with 'money laundering' during negotiations . . . ." (Suarez Br. at 28). As noted above, this is a permissible form of plea bargaining, if the additional charges are supported by probable cause. The charges were simply held in abeyance until it became obvious trial was necessary. Whether defendant was overly surprised at anything in the superseding indictment is unclear.

Suarez makes much of the voluntary dismissal of the Travel Act charges as demonstrating vindictive prosecution by the inclusion of frivolous charges unsupported by probable cause. Facially, as the lower court analyzed them in allowing them to survive Suarez's motion to dismiss, these charges are well pled. Moreover, under some circumstances, one can imagine

a criminal using foreign ATMs to distribute criminal proceeds surreptitiously, and then concealing them further through gambling transactions. *See* 18 U.S.C. § 1952(a)(1). One could alternately give credence to Suarez's claim that his gambling was simply a consequence of his addiction and that its only connection with his conversions was that the thousands of dollars of losses he sustained at the casino created a financial hole that he tried to fill with the property under care of the police. Since the concern of a vindictiveness charge is with the motive of the prosecution, the question here is what the evidence tends to show about the prosecution's belief.

According to the government's brief, its motive was non-retaliatory, although it is candid that the Travel Act charges were somewhat peripheral, being brought, it seems, with the primary purpose of providing an avenue for the presentation of evidence about Suarez's gambling. Although claiming that the "government was prepared to prove" the elements of the Travel Act offenses, (Gov't Br. at 15), it goes on to admit that because it was not sure the theft of employee services claim was "legally viable," it "brought both series of charges relating to the Windsor gambling trips in order to demonstrate to the jury the motive for defendant's alleged bribery and conversion of property charged in Counts 1 and 2." (Gov't Br. at 16). When the charge alleging Suarez had stolen his own services survived the motion to dismiss, "the government no longer needed the Travel Act charges (Counts 10 through 118) in order to demonstrate to the jury the motive for defendant's alleged bribery and conversion, i.e., his gambling in Windsor." (Gov't Br. at 16-17).

The government cites the correct standard from *Bordenkircher*, that "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely his discretion." 434 U.S. at 364. Although it piously claims to have dropped the charges "in order to shorten the jury instructions and the jury's deliberations,"

(Gov't Br. at 17), a page later the government more forthrightly tells us: "The subsequent dismissal of the Travel Act counts was based on one fact only – the district court's denial of the motion to dismiss the former Count 121, . . . which ensured that evidence of defendant's Windsor gambling would be admissible." (Gov't Br. at 18). This might well raise suspicions about the reasonableness of the government's conduct at least as to these charges.

The defendant's main protection against the bringing of unfounded criminal charges, however, is through the institution of the grand jury. *See United States v. Powell*, 823 F.2d 996, 999 (6th Cir. 1987); *United States v. Calandra*, 414 U.S. 338, 343 (1974). The Travel Act charges were all submitted and approved by the grand jury, and defendant does not allege this grand jury was manipulated or otherwise prejudiced against him. Since the indictment was returned, these charges are presumed to have rested on probable cause, and thus their further prosecution is within prosecutorial discretion, absent a retaliatory motive. It may well be that the prosecution considered the evidence was likely to be rather weak and brought these charges primarily for their possible effect on the other "core" charges. However, defendant points to no case that forbids the government's trial strategy.

Even if the prosecution's conduct in regard to the Travel Act charges were thought unreasonable, and the other requirements for vindictiveness were met and not rebutted, the normal remedy is to "bar the augmented charge." *Andrews*, 633 F.2d at 455. Since these charges never even were brought to trial, this would be meaningless; defendant nowhere argues the charges on which he was convicted were vindictively brought.[4] Suarez further argues that a jury could

---

[4] Defendant does claim vindictiveness with regard to all the charges on which he was acquitted, such as money laundering. However, his argument on the merits of the money laundering counts depends on unquestioning acceptance of his view that there could never have been conversion when he first took the jewelry, and that conversion could only have happened in the pawn shop. We rejected this above, and thus the