UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-4949**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

SOMSAK SAEKU,

Defendant – Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.   Terrence W. Boyle, District Judge.  (5:07-cr-00304-BO-1)

Argued:  January 28, 2011              Decided:  April 28, 2011

Before NIEMEYER, KING, and GREGORY, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED**:   Joseph  Michael  McGuinness,  Elizabethtown,  North Carolina, for Appellant.   J. Gaston B. Williams, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** George E. B. Holding, United States Attorney, Anne M. Hayes,  Jennifer  P.  May-Parker,  Assistant  United  States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In 2008, a jury in the Eastern District of North Carolina convicted appellant Somsak Saeku of two wire fraud offenses, in violation of 18 U.S.C. § 1343, plus a single offense of interstate transportation of stolen property, in contravention of 18 U.S.C. § 2314. After being sentenced to 108 months in prison by the district court, Saeku has appealed, pursuing multiple challenges to his convictions and sentence. Among his contentions, Saeku maintains that the court erred in refusing to dismiss the indictment for lack of a speedy trial, and that he was denied a fair trial because of references to his race and immigration status in the prosecutor's closing argument. As explained below, we affirm.

I.

A.

We begin by describing the circumstances underlying Saeku's fraud and interstate theft convictions, as adduced from the evidence presented at trial. The factual recitation is set forth in the light most favorable to the prosecution. See United States v. Brooks, 524 F.3d 549, 563 (4th Cir. 2009). Under the evidence, Saeku engaged a brazen theft and wire fraud scheme in eastern North Carolina and elsewhere, spanning a period of about five years, during which he shoplifted items in

2

bulk from retail stores and sold them on the Internet, and thereafter made false stolen property claims to his homeowner's insurance carrier.

1.

In February 2002, an employee at a Barnes & Noble bookstore in Raleigh observed Saeku shove multiple CDs into his pants before leaving the store. Several mall security officers apprehended Saeku after he reached his vehicle, and the officers found the stolen CDs hidden behind a bush near where Saeku had been walking. A subsequent search of Saeku's vehicle revealed CDs, DVDs, and clothing, which were seized by the officers. After being given <u>Miranda</u> warnings, Saeku admitted that he had stolen the goods seized from his car.

Three years later, in February 2005, at a Christian bookstore in Raleigh, Saeku concealed merchandise in his clothing, took it to his car, and returned to steal more. The manager confronted Saeku and looked into the trunk of his vehicle, where "at least" ten to fifteen CDs and DVDs bearing the store's stickers were found. J.A. 192.[1] The police were summoned and, upon an officer's instruction, Saeku produced additional stolen merchandise from beneath his clothing. On

_____

[1] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

3

August 20, 2005, Saeku stole approximately six DVDs from the Family Christian Bookstore in Raleigh, and then stole ten more on July 4, 2006. In December 2005, an employee in the Borders Bookstore café in Raleigh saw Saeku pick up approximately eight audio books, pull the security stickers from them, and put the audios in his pockets. On May 24, 2006, a barista at a Starbucks in Raleigh saw Saeku conceal several CDs in a newspaper and then leave the store.

On December 16, 2006, a loss prevention agent at a Best Buy store in Raleigh, suspecting the theft of merchandise, confronted Saeku and led him to the store's loss prevention room. There, Saeku pulled eighteen CDs from beneath his clothing. The agent summoned police officers, who arrested Saeku and searched his vehicle — where they found CDs and DVDs "piled high." J.A. 223. As Saeku was being transported to jail, he spontaneously confessed to stealing some of the items. On December 21, 2006, a floor manager at a Circuit City store in Raleigh responded to a customer who had shouted that Saeku was stealing. An employee stopped Saeku briefly, but allowed him to leave. The manager of the store later viewed security tapes that revealed Saeku taking several stolen DVDs to a vacant register, where he deactivated the security stickers.

On January 18, 2007, an employee at an Office Depot in Raleigh saw Saeku with a computer. On confirming that no one

4

had paid for the computer, the employee saw Saeku driving away with it. The employee wrote down the license plate information and contacted the authorities, and police officers then went to Saeku's house and spoke with him regarding the computer theft. Saeku acknowledged that he had recently returned from Office Depot and invited the officers into his kitchen. The officers obtained consent to search Saeku's house, where they found two identical computers, one of which the Office Depot employee had reported stolen. In Saeku's residence, the officers also found large quantities of unopened software, diapers, lawnmowers and other lawn equipment, plus extensive mailing supplies.

2.

In January 2007, Detective Holly Rinaldo of the Raleigh Police Department, upon receiving information that Saeku was selling stolen goods over the Internet, secured and reviewed several police reports involving Saeku. She identified twenty-two reports involving theft-related arrests or criminal charges against Saeku in the Raleigh area. As part of her investigation, Rinaldo placed a tracking device on Saeku's car (with judicial authorization), after which she witnessed him steal merchandise from at least two stores.

Between July 2006 and May 2007, police officers executed four search warrants at Saeku's four-bedroom residence. Detective Rinaldo participated in the last of those searches,

where she noticed shelving made from PVC tubes in almost every room of the residence. The shelving was stocked with well-organized inventories of unopened CDs, DVDs, textbooks, and audio books. Larger items, including power washers, lawn equipment, and fans, were stored underneath the house. The other three searches also revealed PVC shelving and similar inventories. The PVC shelving was seized during the first search, after which Saeku obtained more shelving and restocked his inventories.

Saeku carried out his theft and stolen property scheme by selling stolen goods on the Internet. The second search of his residence revealed extensive records, including post office receipts and records of items shipped, names and addresses of recipients, shipment dates, and prices. Saeku's records identified the shipment of 7353 items in 2005, 7469 items in 2006, and 656 items from January through April 2007. Most of these shipments were made to out-of-state addresses. For example, during a two-week period in January 2006, Saeku's records showed 602 sales, more than 96 percent of which involved shipments to addresses outside North Carolina. The investigators also analyzed bank deposits made to Saeku's accounts and concluded that the deposits exceeded $331,000, and had resulted from sales of stolen merchandise. The

6

investigators calculated the retail value of the items seized from Saeku's residence at more than $552,000.

On July 22, 2005, Saeku contacted Nationwide Insurance, his homeowner's insurer, and filed a claim seeking indemnity for property that had been stolen from his home. In October 2005, Saeku emailed to a Nationwide claims agent an inventory of items that had purportedly been stolen, and also submitted a sworn statement to Nationwide in support of his loss claim. Among the items for which indemnification was sought were computer and electronic equipment, furniture, CDs, DVDs, silverware, jewelry, several suits of men's clothing, and books. Saeku valued the goods allegedly stolen from his residence at $157,162.30, including $18,821 worth of newly released DVDs. Despite requests from Nationwide, Saeku never provided proof of his purchase of any of those items.

B.

The grand jury in the Eastern District of North Carolina indicted Saeku on October 10, 2007, charging him with two counts of wire fraud and a single charge of interstate transportation of stolen property. Saeku first appeared and pleaded not guilty in the district court on December 10, 2007. On December 17, 2007, the court entered a scheduling order requiring that pretrial motions be filed by January 10, 2008, and scheduling Saeku's trial for February 2008. By subsequent orders, the

7

court granted Saeku's two requests for extensions of time to file pretrial motions. The second of those orders also continued Saeku's trial until the court's "May 2008 term of court." Dist Ct. ECF No. 20.[2] Both of the extension orders specified — pursuant to the so-called ends-of-justice exclusion of the Speedy Trial Act — that the ends of justice justified the periods of delay involved, and thus excluded those periods from the seventy-day period within which the Act normally requires a defendant to be brought to trial.[3]

On March 13, 2008, Saeku filed several pretrial motions and the court conducted a hearing on May 13, 2008. By order of June 16, 2008, the court ruled on the outstanding motions and rescheduled the trial for June 30, 2008. On June 24, 2008, the government moved for a trial continuance on the ground that two of its "key" witnesses — an expert who would "substantially shorten" the trial by "summariz[ing] a large volume of financial information," and the local law enforcement officer who had coordinated the investigation of Saeku — were "scheduled to be

---

[2] Citations herein to "Dist. Ct. ECF No. __" refer to the docket entry numbers for documents filed in the district court that are not included in the Joint Appendix.

[3] The pertinent provisions of the Speedy Trial Act establishing the seventy-day period and specifying the periods of delay that may be excluded therefrom are identified and discussed in Part III infra.

out of the area" until July 7, 2008.  Dist. Ct. ECF No. 49, at 1.  Before filing its continuance motion, the prosecutors had contacted Saeku's lawyer, "who stated that [Saeku] neither joins nor concurs in [the] motion, but does not intend to file a motion in opposition."  Id. at 2.  By order of June 25, 2008 (the "Continuance Order"), the court granted the government's continuance motion, rescheduling the trial for the "September term" of court.  J.A. 97.  The Continuance Order specified that it was granted "for good cause shown" and included a handwritten notation that the delay was to be excluded from any Speedy Trial Act computations.  Id.  It did not, however, reference the ends-of-justice exclusion or make any findings relating thereto.  The Continuance Order also did not specifically reference any of the Act's other exclusions from the seventy-day period.

On September 10, 2008, as the prospective jurors entered the courtroom for jury selection, Saeku, proceeding pro se, sought to address the trial court.[4]  The court noted the presence of the prospective jurors and asked Saeku, "[w]hat do you want

---

[4] On September 4, 2008, Saeku sought court approval to proceed pro se and represent himself at trial with the assistance of standby counsel.  On September 9, 2008, the district court conducted a hearing on Saeku's request for self-representation and, by its oral ruling of the same day, granted the motion.  Saeku then indicated that he was "ready to proceed" to trial the next day.  J.A. 112.  On appeal, Saeku is represented by appointed counsel.  In addition, we granted Saeku leave to file a pro se brief.

to say, quickly?" J.A. 124. Saeku stated, without elaborating, that he moved to "dismiss this indictment based on the violation of speedy trial." Id. The court took the matter under advisement and jury selection was conducted. The trial thereafter proceeded to its completion, and the court never expressly addressed or disposed of Saeku's oral motion to dismiss.[5]

## C.

During the trial, both parties made mention of Saeku's race and immigration status. First, in conducting his pro se examinations of witnesses and in addressing the jury, Saeku referenced his race, language skills, and immigration status. See, e.g., J.A. 140 (stating his national origin is Thailand); J.A. 172 ("Although I speak a few languages, English is not my native tongue."); J.A. 277 (referring to his "green card" and Thailand-issued passport). Second, the prosecutor began his closing argument by responding to Saeku's references to race and immigration status, urging the jury to "find the defendant

---

[5] The wire fraud offenses were tried on the theory that Saeku had engaged in a scheme to defraud Nationwide Insurance by way of two separate communications, the July 22, 2005 phone call and the October 2005 email, in both of which he represented that he was the rightful owner of the property purportedly stolen. The interstate transportation of stolen property offense was tried on the theory that Saeku's interstate shipments of stolen goods from Internet sales exceeded the $5000 jurisdictional amount required under 18 U.S.C. § 2314.

guilty, whether [he is] a citizen or whether [he is] a visitor." J.A. 414. The prosecutor then reviewed and argued the evidence introduced against Saeku. The prosecutor concluded by admonishing the jury not to consider the personal attributes that Saeku had previously mentioned:

> I urge you to consider the evidence and the law only, not whether Mr. Saeku looks a little different than some other folks. He looks a lot like other folks. . . . Don't consider that he is a visitor. He has the same constitutional protections as we all do as citizens.
>
> Don't consider the way he speaks . . . . [A]lthough he may speak with an accent and may not be a lawyer, he understands and can process thoughts in the English language, when he chooses to.
>
> . . . .
>
> Disregard the way he looks. Focus on the law and the evidence, please. It's a part of your duty as jurors. It's a part of the instructions. It's a part of why we have a Constitution that is revered by nations of the world.

J.A. 419.

On September 11, 2008, the jury returned its verdict of guilty against Saeku on all three offenses. On November 12, 2008, the district court sentenced Saeku to a prison term of 108 months, plus three years of supervised release, restitution, and forfeiture. Saeku has filed a timely appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

11

## II.

We review de novo a district court's interpretation of "the Speedy Trial Act, and review any of the court's related factual findings for clear error." United States v. Rodriguez-Amaya, 521 F.3d 437, 440 (4th Cir. 2008) (internal quotation marks omitted). On the other hand, we review for plain error an appellate contention that was not preserved in the district court. See Fed. R. Crim. Pro. 52(b); United States v. Olano, 507 U.S. 725, 731–32 (1993).

## III.

As mentioned earlier, Saeku has raised multiple issues on appeal, only two of which warrant a sustained discussion. More specifically, Saeku contends that the grand jury was tainted by references to his race and immigration status; that the trial court erred in authorizing him to represent himself pro se; that the court failed to conduct voir dire and improperly limited his peremptory challenges; that the court erred in not dismissing the indictment for violations of his speedy trial rights; that the court erred by excluding him from bench conferences and in not permitting him to deliver exhibits to witnesses; that the court erred in denying his motion to suppress evidence seized during a search of his residence; that the court intervened excessively to limit his examination of witnesses; that the

12

court erred in admitting opinion testimony; that the court erred in failing to exclude evidence obtained by the prosecutors in violation of his Miranda rights; that the charges against him violated the Double Jeopardy Clause of the Fifth Amendment; that the evidence was insufficient to support any of his three convictions; that the court erred in conducting hearings outside his presence; that the court erred in its instructions to the jury; that the two wire fraud charges were fatally multiplicious; that the prosecutor's closing argument improperly referenced Saeku's race and immigration status; that the sentence imposed by the court was unreasonable; that the court erred in ordering forfeiture; and that cumulative errors deprived him of his Fifth Amendment right to due process.

Put succinctly, only the speedy trial issue and the assertions regarding the propriety of the prosecutor's closing argument warrant further discussion. We have carefully considered each of Saeku's other contentions of error and are satisfied to reject all of them for lack of merit. That said, we turn to the speedy trial and closing argument contentions.

A.

Under the Speedy Trial Act, the district court was obliged to "commence" Saeku's trial "within seventy days . . . from the date [he] has appeared before a judicial officer of the court." 18 U.S.C. § 3161(c)(1). Pursuant to 18 U.S.C. § 3161(h),

13

certain periods of delay are excluded from the seventy-day period — that is, they do not count against the statutory "speedy-trial clock." A court's failure to commence a trial within the seventy-day period can result in a dismissal if the defendant so moves "prior to trial." Id. § 3161(a)(2).[6]

On appeal, Saeku contends that the delay resulting from the Continuance Order — the seventy days from June 25 to September 4, 2008 — should not be excluded from the speedy-trial clock.[7] If that seventy-day delay is excluded, Saeku does not dispute that his trial began in a timely manner, within the statutory seventy-day period. Two of the Speedy Trial Act's exclusions are pertinent in evaluating this contention. First, "[a]ny period of delay resulting from the absence or unavailability of . . . an essential witness" is excluded. 18 U.S.C.

---

[6] We are also content to reject the government's assertion that, under our precedent, Saeku's oral motion to dismiss on September 10, 2008, was untimely because it was made after "the beginning of the court day when voir dire begins." Br. of Appellee 37 (emphasis added). The government misconstrues our precedent in that respect. See United States v. A-A-A Elec. Co., 788 F.2d 242, 246 (4th Cir. 1986) (ruling that, for purposes of the Speedy Trial Act, "trial commence[s] at the time of voir dire" (emphasis added)). Instead of deeming the oral motion to dismiss untimely, however, we assume that the motion was timely made, but reject it for lack of merit.

[7] The period from September 4, 2008, to September 9, 2008, is excluded from the speedy-trial clock on account of the pendency of Saeku's motion to represent himself pro se, filed on September 4, 2008. See 18 U.S.C. § 3161(h)(1)(D).

14

§ 3161(h)(3)(A). Second, "[a]ny period of delay resulting from a continuance granted by any judge . . . , if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial" is also excluded. Id. § 3161(h)(7)(A).

Saeku is correct that the delay occasioned by the Continuance Order cannot be excluded under the ends-of-justice exclusion; the district court did not make any "express findings," and it could not do so on remand. See Zedner v. United States, 547 U.S. 489, 506-07 (2006). We are convinced, however, that the delay attributable to the Continuance Order was properly excluded under the essential-witness exclusion, which provides "ample independent statutory authority for excluding [a period] of delay from the speedy trial calculation" where the ends-of-justice exclusion does not apply. United States v. Allen, 235 F.3d 482, 491 (10th Cir. 2000). A trial court's award of a continuance under the essential-witness exclusion need not be accompanied by "specific findings that the ends of justice require the continuance." United States v. Bourne, 743 F.2d 1026, 1031 (4th Cir. 1984) (per curiam). Similarly, a trial continuance is not necessarily faulty simply because "the district court fail[ed], in granting the continuance, to identify" the specific exclusion being relied

15

upon.  United States v. Keith, 42 F.3d 234, 239-40 (4th Cir. 1994).

The threshold issue on this point is whether the Continuance Order is somehow flawed because it did not expressly find that the two government witnesses were both essential and unavailable.  Put succinctly, however, the essential-witness exclusion does not require any such findings.[8]  See United States v. Garcia, 995 F.2d 556, 560 (5th Cir. 1993) (excluding period of continuance where court "impliedly found" witness essential); United States v. Barragan, 793 F.2d 1255, 1258 (11th Cir. 1986) (excluding period of continuance where court "never explicitly ruled on" continuance motion, but "in effect granted the requested continuance" on basis of essential-witness exclusion). In adopting the Speedy Trial Act, Congress knew how to require express findings by a district court.  For example, a continuance granted pursuant to the ends-of-justice exclusion is excludable only if "the court sets forth, in the record of the case, either orally in writing, its reasons for finding that the ends of justice" justify the continuance.  18 U.S.C.

_____

[8]  Notwithstanding our ruling here, we observe that the better practice would be for a continuance request to expressly rely on the essential-witness exclusion, and for the court, in granting such a continuance, to expressly find that the requirements of that exclusion have been satisfied.

16

§ 3161(h)(7)(A). By contrast, the essential-witness exclusion contains no such requirement. Moreover, the Continuance Order, by explicitly finding that the continuance was granted "for good cause shown," J.A. 97, incorporated the supporting facts of the underlying motion. See United States v. Bruckman, 874 F.2d 57, 61-62 (1st Cir. 1989). The government's continuance motion, in turn, clearly explained that two "key" witnesses were unavailable.

Turning to the substance of the essential-witness exclusion, its applicability in these circumstances depends on two inquiries: first, whether at least one of the witnesses was "essential"; and second, whether the exercise of due diligence would have produced each essential witness for trial. We have addressed the second inquiry in our prior decisions, and so we begin there. A witness is "unavailable" where "his whereabouts are known but his presence for trial cannot be obtained by due diligence." 18 U.S.C. § 3161(h)(3)(B). "Due diligence" requires merely "reasonable efforts," not "maximum feasible diligence." United States v. Patterson, 277 F.3d 709, 711-12 (4th Cir. 2002). The unavailability bar is not a high one; in one case, a witness's prior wedding and honeymoon plans rendered him unavailable. See United States v. Meyer, 803 F.2d 246, 247-48 (6th Cir. 1986). Here, two witnesses were "scheduled to be out of the area," and the record provides no basis for upsetting

17

the court's implicit determination that it would have been unreasonable to compel them to return for trial as scheduled.

The continuance motion thus provided a sufficient basis for the district court to find that the two witnesses were unavailable. First, prior travel plans can render a witness unavailable, and Saeku never challenged the veracity or good faith of the representations made in the continuance motion by the United States Attorney. Second, to the extent the continuance motion lacks detail, relief is unwarranted. Saeku, who was then represented by counsel, contributed to any lack of detail by not expressly opposing the motion, depriving the prosecution of any opportunity to further support its request. See Keith, 42 F.3d at 239-40 (discussing what court called "sandbagging" problem, and observing that defendant cannot seek dismissal on basis of continuance to which he "affirmatively consent[ed]," and where record supports continuance).

With respect to the first inquiry — whether the two witnesses mentioned in the continuance motion were "essential" — the district court similarly possessed a sufficient record to deem them so. Although the Act does not define an "essential witness," the accompanying Senate Judiciary Committee report explains that the term refers to a witness "so essential to the proceeding that continuation without the witness would either be impossible or would likely result in a miscarriage of justice,"

18

giving as an example "a chemist who has identified narcotics in the defendant's possession." S. Rep. No. 93-1021, at 37 (1974). In addressing this point, we benefit from the guidance of several of our sister circuits, none of which have required the witness's testimony to be so important that conviction could not be obtained in its absence. See United States v. Miles, 290 F.3d 1341, 1350 (11th Cir. 2002) ("A witness may be deemed essential for the purposes of the [Speedy Trial] Act, even though the government could obtain a conviction without his testimony."); Allen, 235 F.3d at 491; United States v. Hamilton, 46 F.3d 271, 276-77 (3d Cir. 1995) (same); United States v. McNeil, 911 F.2d 768, 773 (D.C. Cir. 1990) (similar); United States v. Eagle Hawk, 815 F.2d 1213, 1218 (8th Cir. 1987) (similar); United States v. Tedesco, 726 F.2d 1216, 1222 (7th Cir. 1984) (same); United States v. Marrero, 705 F.2d 652, 656 (2d Cir. 1983) (similar).

A well-crafted formulation of the applicable rule is found in the Eighth Circuit's Eagle Hawk decision, which explained that

> [w]here a witness is unquestionably important, and the government has a good faith belief that it will use that witness's testimony at trial, that witness may be deemed "essential" for purposes of the Speedy Trial Act. If, however, the witness's anticipated testimony will be merely cumulative, or substantially irrelevant, that witness should be deemed non-essential.

19

815 F.2d at 1218. The assessment of a witness's importance before the witness testifies is necessarily a difficult endeavor, however, and a reviewing court should not "second-guess" the trial court's determination "based upon hindsight." McNeil, 911 F.2d at 773. Whether a witness is essential "is a quintessential question of fact." Allen, 235 F.3d at 491. Similarly, questions of "whether 'a miscarriage of justice' 'would likely result'" implicate the "sound discretion of the district judge." Marrero, 705 F.2d at 657. In this vein, we have previously affirmed a trial court's determination that a witness was essential, deferring to its superior familiarity with the anticipated testimony and its importance. See Bourne, 743 F.2d at 1030-31.

Applying these principles here, the district court possessed a sufficient basis to deem either of the two witnesses essential. The summary witness's testimony was expected to break down a vast quantity of records and financial information into usable statistics and significantly circumscribe the trial, thereby enhancing judicial economy and reducing the likelihood that jurors might be confused by voluminous evidence. Cf. United States v. Wainright, 351 F.3d 816, 820-21 (8th Cir. 2003) (affirming court's decision to admit summary evidence where defendant charged with interstate transportation of stolen property). Similarly, the other witness, the primary

20

investigator, would normally be expected to provide important testimony. This officer oversaw many aspects of the investigation and had personal knowledge of facts relating to Saeku's fraud scheme. Notably, Saeku nowhere suggests that the evidence of these witnesses could have been obtained some other way, cf. Bourne, 743 F.2d at 1030-31, or that the prosecutor did not have a good-faith belief that the government would need these witnesses at trial. Indeed, the descriptions of anticipated testimony in the continuance motion were sufficiently detailed — the motion precisely (if briefly) described the anticipated testimony of both witnesses and how that evidence related to the charges. As such, the prosecution "show[ed] how the testimony that it expect[ed] a particular witness will give fits within the overall framework of its case, and why that witness's testimony would be not only useful, but essential." McNeil, 911 F.2d at 774.[9]

---

[9] Although the continuance motion sought a delay "until after July 14, 2008," the Continuance Order continued the case until September 2008. Dist. Ct. ECF No. 49, at 2. Nonetheless, the entire period of the continuance — and not just the period the witnesses were unavailable — is excluded from the speedy-trial clock because the statutory phrase "resulting from" mandates the exclusion of all time granted pursuant to the continuance. See Miles, 290 F.3d at 1350-51.

B.

Finally, we address the prosecutor's entreaty to the jury in his closing argument that it should not consider Saeku's race or immigration status. To prevail on this unpreserved contention of error, Saeku must meet the plain error standard of United States v. Olano, which requires the presence of (1) an error, that is (2) plain, and (3) affects the defendant's "substantial rights." 507 U.S. 725, 732 (1993). Even then, we will grant relief only if we determine, in our discretion, that "the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. (internal quotation marks and alterations omitted). Indeed, relief under the plain error test "demand[s] strenuous exertion." United States v. Dominguez Benitez, 542 U.S. 74, 82 (2004).

The established principles governing the propriety of challenged prosecutorial remarks to a jury are likewise demanding. To prevail, a defendant "must show [1] that the remarks were improper and [2] that they prejudicially affected the defendant's substantial rights so as to deprive [him] of a fair trial." United States v. Adam, 70 F.3d 776, 780 (4th Cir. 1995) (internal quotation marks omitted). To properly gauge whether a defendant suffered such prejudice, we must examine several factors, including the following:

22

(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

Id. (internal citations omitted). Importantly, we also evaluate "(5) whether the prosecutor's remarks were invited by improper conduct of defense counsel and (6) whether curative instructions were given to the jury." United States v. Wilson, 135 F.3d 291, 299 (4th Cir. 1998) (internal quotation marks omitted).

To begin with, it is not at all clear that the remarks challenged by Saeku were improper. In United States v. Alzanki, the First Circuit relied in part on a prosecutor's plea in closing argument that the jury not consider the defendant's ethnicity and nationality to conclude that the risk of prejudice resulting from the jury's knowledge of those aspects of the defendant's background had, in fact, been ameliorated. See 54 F.3d 994, 1007 (1st Cir. 1995). As in Alzanki, the prosecutor's remarks in this case were not inflammatory and did not appeal to prejudice; rather, they took the form of a plea not to consider irrelevant or impermissible grounds. Moreover, there is no indication that the prosecutor, by isolated references in his lengthy closing argument, sought to invite adverse attention to Saeku's race or immigration status; on the contrary, the

23

prosecutor's references were occasioned by Saeku's previous injection of those issues into the trial.

Nevertheless, any discussion of a defendant's race or immigration status before a criminal jury is a sensitive issue. Such references — even this prosecutor's sincere plea for the jury not to consider irrelevant matters that Saeku himself first brought up — are not to be encouraged. In United States v. Young, the Supreme Court addressed the "all too common occurrence in criminal trials" where "the defense counsel argues improperly, provoking the prosecutor to respond in kind, and the trial judge takes no corrective action" — warning that "[c]learly two improper arguments . . . do not make for a right result." 470 U.S. 1, 11 (1985). As the Court explained, "[p]lainly, the better remedy" is for the trial court "to deal with the [defense counsel's] improper argument . . . promptly and thus blunt the need for the prosecutor to respond," or for the prosecutor to "object[] to the . . . improper statements with a request that the court give a timely warning and curative instruction to the jury." Id. at 13. The Court also pointed out that, "[a]t the very least," the prosecutor could have sought a bench conference out of the jury's presence to suggest an appropriate curative instruction. Id. at 13-14. Heeding Young, there were better ways to address Saeku's references to his race and immigration status.

24

Ultimately, however, we need not definitively resolve the propriety of the prosecutor's remarks, because they were not prejudicial. The evidence of Saeku's guilt was overwhelming, and the challenged statements were few in number and made in passing during a protracted closing argument. Additionally, the prosecutor merely cautioned the jury that it was sworn to render its verdict solely on the facts and the law, and did so only after Saeku had injected his race and immigration status into the trial. Cf. United States v. Roach, 502 F.3d 425, 435-36 (6th Cir. 2007) (finding no reversible error where prosecutor's closing argument referred to race and immigration status of victims, because remarks, although "condemn[able]," were isolated, did not encourage jury to render verdict on improper ground, and were in response to defense counsel's own "race-baiting"). In sum, the failure to follow the better practices outlined in Young is not necessarily error, and, even assuming error, Saeku clearly suffered no prejudice.

IV.

Pursuant to the foregoing, we affirm the judgment of the district court.

AFFIRMED

25